**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| WILLIAM S. KAYE, LIQUIDATING TRUSTEE OF BFW LIQUIDATION, LLC f/k/a BRUNO'S SUPERMARKETS, LLC, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:09-cv-2263-M |
| LONE STAR FUND V (U.S.), L.P., LONE STAR PARTNERS V, L.P., LONE STAR MANAGEMENT CO. V, LTD., LSF V INTERNATIONAL FINANCE, L.P., LSF5 AFFILIATE FINANCE CO. LTD., LSF5 BRUNO'S HOLDINGS, LLC, LSF5 BRUNO'S INVESTMENTS, LLC, HUDSON ADVISORS, LLC, IN LINE INVESTMENTS, LLC, BRIAN P. CARNEY, KEITH D. MILLS, KYLE DAVID GAYLER, MARC LEWIS LIPSHY, LAYNE B. LEBARON, DAVID M. WEST, LEN WILLIAM ALLEN, JR., SCOTT MICHAEL NORTH, ROBERT M. ZIELINSKI, KENT MOORE, MICHAEL A. PRUSHAN, BRIAN HOTAREK, and KENNETH JONES, | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are motions to dismiss filed by Kent Moore, Scott Michael North, David

F. Mills, Robert Zielinski, and Kyle David Gayler (collectively, the "Bruno's Officer

Defendants") [Docket Entry #46]; Brian Hotarek, Brian P. Carney, and Kenneth Jones

(collectively, the "BI-LO–Bruno's Defendants") [Docket Entry #47]; and Lone Star Fund V

(U.S.), L.P., Lone Star Partners V, L.P., Lone Star Management Co. V, Ltd., LSF V International

Finance, L.P., LSF5 Affiliate Finance Co. Ltd., LSF5 Bruno's Holdings, LLC, LSF5 Bruno's Investments, LLC, Hudson Advisors, LLC, In Line Investments, LLC, Marc Lewis Lipshy, Layne B. Lebaron, David M. West, Len William Allen, Jr, and Michael A. Prushan (collectively, the "Lone Star Defendants") [Docket Entry #48]. Also before the Court is Plaintiff's Objections to and Motion to Strike Exhibits [Docket Entry #56].

For the reasons stated below, Plaintiff's Objections to and Motion to Strike Exhibits is **GRANTED** in part and **DENIED** in part; the Lone Star Defendants' Partial Motion to Dismiss, and the BI-LO–Bruno's Defendants' Motion to Dismiss are **DENIED**; and the Bruno's Officer Defendants' Motion to Dismiss or, in the Alternative, Motion for More Definite Statement is **GRANTED** in part and **DENIED** in part. The Court grants Plaintiff leave to amend his claims against the Bruno's Officer Defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

Bruno's was founded in 1932 as a local market. By 2005 it had grown into a regional food retailer, operating 192 stores in the southeastern United States. On February 5, 2009, Bruno's filed a Chapter 11 bankruptcy reorganization proceeding. A plan of reorganization was confirmed on September 25, 2009, with an effective date of October 6, 2009. Bruno's has insufficient assets to satisfy the claims of its creditors. The plan or reorgination anticipates that Bruno's unsecured creditors will recover only through successful claims brought by the Trustee.

The Trustee filed this suit against Bruno's corporate parents, their affiliates, other related companies, and several of Bruno's former directors and officers, seeking to recover alleged fraudulent transfers and preferences under the Bankruptcy Code and Alabama state law, and alleging breaches of fiduciary duties under Delaware law. Due to the presence in this case of numerous defendants who are represented by different counsel, the Court employs various labels

to identify particular groups of defendants. In addition to the labels defined above, the Court uses the term "Individual Defendants" to refer collectively to all the individual, non-entity defendants. Further, the Court uses the term "Moving Defendants" when referring collectively to the Bruno's Officer Defendants and the BI-LO–Bruno's Defendants.

## I. Factual Allegations

The following is a summary of the allegations in the Amended Complaint that are relevant to the Motions currently before the Court.[1]

### A. Lone Star Purchases BI-LO and Bruno's

After emerging from a prior bankruptcy in 2000, Bruno's[2] was purchased by Ahold U.S.A. Holdings, Inc. Ahold combined Bruno's with BI-LO Holdings, LLC and its wholly-owned subsidiary, BI-LO, LLC ("BI-LO"), and as a result, BI-LO, which also was a regional grocery store chain, owned all of the equity in Bruno's. In January 2005, Lone Star U.S. Acquisitions, LLC acquired BI-LO Holdings for a purchase price of $669,581,000 (the "Lone Star Acquisition"). BI-LO and Bruno's, as consolidated entities, were operating at a loss before the sale to Lone Star Acquisitions,[3] and Ahold had to provide financial support so that the consolidated entities could continue operations through the closing date of their sale to Lone Star.

After the Lone Star Acquisition, BI-LO Holdings was immediately assigned to a newly formed entity, LSF5 BI-LO Investments, LLC, which is the wholly owned subsidiary of LSF5 BI-LO Holdings, LLC. LSF5 BI-LO Holdings is wholly-owned by Lone Star Fund V (U.S.),

---

[1] It is not a comprehensive recitation of the Amended Complaint's allegations, nor does it constitute factual findings by the Court.

[2] The Court refers to Bruno's Supermarkets, Inc., Bruno's, Inc. (the company emerging from Bruno's bankruptcy in 2000), as well as all other predecessors in interest to Bruno's, simply as "Bruno's."

[3] In support of this allegation, the Amended Complaint alleges that BI-LO Holdings, LLC and its subsidiaries had an accumulated membership interest deficit of $475,025,000 as of January 1, 2005.

L.P. ("Lone Star") and its affiliates.[4]

B.      Allegations of Insolvency and Undercapitalization in 2005

Prior to 2007, BI-LO and Bruno's financials were prepared on a consolidated basis.  The Trustee claims that Bruno's as a stand-alone entity was insolvent, severely undercapitalized, and operating at a loss in 2005.  In support of these assertions, the Trustee cites a report prepared in March 2006 by William Blair & Company, LLC for Lone Star (the "William Blair Report" or the "Report"), which was based on Bruno's 2005 financial data.  The William Blair Report states that BI-LO would sell for $102,791,000 to $500,527,000 more as a stand-alone entity than if sold as a combined entity with Bruno's.  According to the Report, "'the dilutive effects of [Bruno's] [we]re clear,'" and the chances of selling BI-LO with Bruno's attached were "'extremely limited and probably non-existent if [Bruno's] performance [was] not significantly improved.'"  (Am. Compl. ¶ 30 (first and third alterations in original).)  Based on these allegations, the Trustee asserts that Bruno's had a negative equity value and was balance sheet insolvent in 2005.

The Amended Complaint also alleges facts concerning Bruno's operating performance.  The William Blair Report states that Bruno's had a history of "'negative operating performance . . . [that could] only be reversed with significant investments of time, capital and management attention.'"  (*Id.* ¶ 31 (alteration in original).)  Further, Bruno's had substantial federal and state net operating loss ("NOL") carryforwards in 2005.  In particular, Bruno's had NOL carryforwards of approximately $150,000,000 in Alabama in January 2005, which rose to $210,000,000 by December 30, 2006.  The Trustee alleges this increase reflects that Bruno's continued to incur significant operating losses over that time period.  Furthermore, "the William Blair Report states that there was 'limited availability of all of the necessary elements required

---

[4] Therefore, the resulting corporate structure was that Bruno's was wholly-owned by BI-LO, which was wholly-owned by BI-LO Holdings, LLC, which was wholly-owned by LSF5 BI-LO Investments, LLC, which was wholly-owned by LSF5 BI-LO Holdings, LLC, which was wholly-owned by Lone Star Fund V (U.S.), L.P.

for reversal' of Bruno's history of operating losses." (*Id.*)  This "pattern of significant operating losses in 2005 and 2006," the Trustee alleges, contributed to Bruno's insolvency, including "cash flow insolvency." (*Id.*)

The Amended Complaint further alleges that Bruno's was "severely undercapitalized." The William Blair Report states that Bruno's was "in need of significant capital investment, and the return on this investment [wa]s unclear." (*Id.* ¶ 31 (internal quotation marks omitted).) Specifically, the Report called for $67 million of capital improvement.  According to the Amended Complaint, Bruno's management also believed that a lack of capital investment was an issue that eventually contributed to Bruno's demise.  In support of this allegation, the Amended Complaint cites an affidavit by Scott North, executed in March 2009 and submitted in Bruno's bankruptcy, that states, "'Bruno's undercapitalized position has prevented it from updating facilities to make them fresh and current and comparable to its competitors . . . .  The result has been a marked decline in sales and market share in the Bruno's stores.'" (*Id.* ¶ 32; (quoting North Aff. 2, Mar. 7, 2009, ECF No. 49-4).)  The Amended Complaint claims that this lack of adequate capital dates back to 2005.

The William Blair Report also states that Bruno's union relationships further reduced the value of Bruno's.  Bruno's entered into collective bargaining agreements ("CBAs") beginning in 2005, while Bruno's competitors in the region were non-union operators.  The CBAs contained successorship clauses that required any prospective purchaser of Bruno's to assume the CBAs, allegedly limiting Bruno's attractiveness to potential buyers.  According to the Amended Complaint, Timothy Carroll, a principal of William Blair & Company, LLC, presented an affidavit to this effect in March 2009, in Bruno's bankruptcy, stating, "'It is my professional opinion that the existence of a requirement to sell the Bruno's stores inclusive of the collective

bargaining agreement materially reduces the attractiveness and value of the assets . . . .'" (*Id.* ¶ 33 (omission in original) (quoting Carroll Aff. 2, Mar. 6, 2009, ECF No. 49-2).)  In fact, Bruno's management described the successorship clauses in the CBAs as "'an impenetrable barrier to selling [Bruno's] stores.'" (*Id.* (alteration in original) (citing Wade Aff. 7–8, Mar. 7, 2009, ECF No. 49-3).)

C.  The 2005 Restructure

Lone Star significantly restructured BI-LO and Bruno's immediately following the Lone Star Acquisition (the "2005 Restructure").  As part of this restructuring plan, Lone Star outsourced distribution by selling BI-LO's warehouse and transportation assets to C&S Wholesale Grocers, Inc.  On December 22, 2004, BI-LO entered into a ten-year supply agreement with C&S, under which BI-LO would purchase most grocery products for BI-LO and Bruno's exclusively from C&S.

Additionally, in June 2005, Lone Star raised money through property sale-leasebacks with Cardinal Capital Partners, Inc., involving twelve properties owned by Bruno's upon which it operated stores (the "Cardinal Transaction").  The Trustee alleges that Lone Star retained the $60,290,342 in proceeds from the sale of the properties.  Defendant Marc Lipshy signed the Contract of Sale with Cardinal for both Bruno's and BI-LO, while also serving as an officer of Lone Star.

D.  Allegations of Lone Star's Control of Bruno's Through BI-LO

The Amended Complaint alleges that Lone Star implemented the 2005 Restructure in order to effectively control and operate its wholly-owned subsidiaries as a singular unit with the sole purpose of profiting the parent company.

To demonstrate this alleged purpose, the Amended Complaint observes that the directors and officers of BI-LO and Bruno's overlapped. In January 2007, the directors of both BI-LO and Bruno's were Defendants Len Allen, David West, and Brian Hotarek. Defendants Brian Hotarek, Brian Carney, Kenneth Jones, Marc Lipshy, and Layne LeBaron were officers of both companies.

Some of Bruno's directors and officers were also employees, directors, or officers of Bruno's parent company, Lone Star. Defendant David West was Chairman and Defendant Marc Lipshy was Vice President of Lone Star Management Co. V, Ltd., which ultimately controls Lone Star.[5] West also served as and officer of Lone Star U.S. Acquisitions, LLC, as did Allen. Additionally, some of the directors and officers of Bruno's—West, Allen, Lipshy, and Defendant Mike Prushan—were also officers of Lone Star's affiliated investment manager, Hudson Advisors, LLC.

All of Bruno's corporate actions taken during this time period were accomplished by the unanimous written consent of either Bruno's directors or its sole stockholder, BI-LO, without an actual meeting.

E.  BI-LO and Bruno's Financial Conditions After the Lone Star Acquisition and Restructure

Bruno's statement of operations for the year ended December 30, 2006 showed an annual net loss of $30,432,000. The Trustee alleges that in 2006, Lone Star decided to sell the BI-LO Brand, and that, according to news reports,[6] BI-LO was estimated to garner a price in the range of $425 million to $550 million, even though Lone Star had purchased the company only two years earlier for $660 million. Lone Star engaged Merrill Lynch and William Blair to explore

---

[5] Lone Star Fund V (U.S.), L.P.'s general partner is Lone Star Partners V, L.P., with its general partner being Lone Star Management Co. V, Ltd.

[6] It is unclear from the Amended Complaint whether such estimates were merely reported by news outlets or whether the estimates were produced by the news outlets themselves.

the sale of BI-LO, and it was then that the William Blair Report was prepared, estimating that BI-LO could sell for up to $500 million more if it was not combined with Bruno's.

BI-LO was in negotiations with ACON Funds Management LLC in late 2006 to sell Bruno's as a stand-alone entity. In a proposal from BI-LO to ACON dated November 8, 2006, BI-LO attached a Bruno's balance sheet that showed total assets of $152,631,000 and total liabilities of $162,030,000 (including intercompany liabilities owed by Bruno's to BI-LO). This proposal was signed by Brian Carney, as Executive Vice President and CFO of BI-LO. At the time, Carney held the same positions at Bruno's. This balance sheet calculation did not reference additional negative factors, such as the CBA successorship clause and overdue capital investment requirements, that the Trustee claims would have significantly reduced the value of Bruno's to any prospective buyer. ACON opted not to purchase Bruno's.

Furthermore, according to the Amended Complaint, in the beginning of 2007, Bruno's had a negative EBITDA[7] and remained balance sheet insolvent.

F.       The Spin-Off of Bruno's from BI-LO

In March 2007, Lone Star spun off Bruno's from BI-LO, making Bruno's, like BI-LO, a separate subsidiary of Lone Star (the "Spin-Off").[8] According to the Amended Complaint, the Spin-Off consisted of a series of transactions through which BI-LO's interests in Bruno's were sold to Lone Star's affiliate LSF5 Bruno's Investments, LLC, and many of BI-LO's financial burdens were transferred to Bruno's in an effort to improve BI-LO's marketability.

The purchase price for Bruno's was paid with a promissory note from LSF5 Bruno's Investments to BI-LO, under which no payments of either interest or principal were due for five

---

[7] Earnings Before Interest, Taxes, Depreciation, and Amortization.
[8] As part of this transaction, Bruno's Supermarkets, Inc. merged with Bruno's, Inc. and became Bruno's Supermarkets, LLC. BI-LO then sold 100% of its membership interests in Bruno's Supermarkets, LLC to the newly-formed LSF5 Bruno's Investments, LLC, which was wholly-owned by the newly-formed LSF5 Bruno's Holdings, LLC, which was in turn wholly-owned by Lone Star.

years.  The Trustee alleges that, in light of Bruno's insolvency and history of operating losses, the Individual Defendants knew that this promissory note would never be collected and, thus, that LSF5 Bruno's Investments paid essentially nothing for Bruno's, other than its assumption of Bruno's liabilities, which Lone Star already had direct or indirect responsibility for before the Spin-Off.  As confirmation that the Defendants believed the note was worthless, the Amended Complaint points to an e-mail from a Bruno's officer to a vice president of Hudson Advisors, stating that the intercompany note reflected "'the price Lone Star "paid" Bi-Lo for Bruno's.'" (Am. Coml. ¶ 41.)

Furthermore, the Amended Complaint avers that the Individual Defendants "knew that Bruno's would fail as a stand-alone entity, yet agreed to the [Spin-Off] to benefit Lone Star and BI-LO."  (Am. Compl. ¶ 43.)  In support of this allegation, the Amended Complaint observes that Bruno's was budgeted to lose $11,697,000 in 2007 before taxes, but actually lost $30,719,000.

### 1.    *The Lease Assignment*

As part of the Spin-Off, and pursuant to an Assignment and Assumption of Leases dated March 23, 2007 (the "Lease Assignment"), which was signed by Brian Hotarek as President and CEO of both Bruno's and BI-LO, Bruno's was required to assume BI-LO's liability on the leases of twelve stores.  BI-LO had incurred these lease obligations as part of the Cardinal Transaction. Many of the stores subject to the Lease Assignment were losing money and had average rental rates almost 50% higher than the average rent for other stores operated by Bruno's.  According to BI-LO's 2007 financials, Bruno's future rental obligations under these twelve leases were $116.99 million.  Following the Lease Assignment, Bruno's performed under these leases for

almost two years, paying approximately $13 million. Bruno's allegedly also sustained operating losses in excess of $15 million as a result of the continued operation of these stores.

2. *The C&S Supply Agreement*

Also as part of the Spin-Off, BI-LO's supply agreement with C&S was bifurcated, so that BI-LO and Bruno's maintained separate contracts with C&S. Bruno's Interim Supply Agreement, dated March 23, 2007, was signed by Brian Hotarek as CEO of Bruno's and included a successorship clause obligating a purchaser of Bruno's to assume all obligations under its supply agreement. BI-LO's new supply agreement did not contain such a clause. BI-LO also transferred to Bruno's its obligations to repurchase the C&S Alabama distribution facility, at net book value, and to reimburse C&S for any severance costs in the event the supply agreement was terminated by C&S. BI-LO's December 30, 2006 financials show that the net book value of the C&S Alabama warehouse and office facility was $37,522,000 as of December 30, 2006, plus fixed asset additions made by C&S worth $1,693,000. Bruno's supply agreement also obligated it to purchase a certain volume of merchandise from C&S, and imposed surcharges on Bruno's if those volume requirements were not met. Bruno's paid approximately $4,178,159 in volume surcharges to C&S from March 23, 2007 to November 27, 2008. The Amended Complaint estimates that Bruno's would have paid $69,149,063 to C&S for volume surcharges if the contract had remained in effect for its full ten year term.

The Trustee charges that Bruno's management knew the C&S supply agreement was unfavorable to Bruno's but allowed Lone Star to negotiate with C&S for better terms for BI-LO in exchange for worse terms for Bruno's. In support of this theory, the Amended Complaint

cites a business plan dated September 18, 2007 that described the C&S supply agreement with Bruno's as "restrictive" and "punitive."[9]  (Am. Compl. ¶ 46.)

### 3. *The Alleged Effects of the Spin-Off*

The Trustee alleges that the Spin-Off drove Bruno's deeper into insolvency by further devaluing Bruno's.  Bruno's opening balance sheet, released on March 29, 2007, showed a membership interest value of zero, reflecting assets equal to liabilities.  However, the Trustee contends that this balance sheet actually demonstrated that Bruno's was insolvent immediately following the Spin-Off.  Under GAAP requirements, an opening balance sheet cannot show equity value below zero.  The Trustee maintains that the amount of negative goodwill resulting from the Spin-Off was reduced in the balance sheet to inflate the value of Bruno's assets and force the membership interest value to zero.  BI-LO reported a larger negative goodwill figure in its 2007 audited financials, and the Trustee alleges that when that larger figure is factored into the balance sheet, it shows that Bruno's was balance sheet insolvent immediately following the Spin-Off.  Further, as with the November 2006 balance sheet sent to ACON, the Trustee alleges that Bruno's opening balance sheet did not take into account certain negative contingencies that would be considered in a fair market valuation, such as the CBA successorship clause, the C&S supply agreement, and overdue capital investment requirements, all of which allegedly would significantly reduce the Bruno's value to any perspective buyer.

### G. Attempted Sale of BI-LO

On April 10, 2007, less than three weeks after the Spin-Off, Lone Star announced that BI-LO was being offered for sale.  The day after the public announcement that Lone Star was looking for a buyer, BI-LO President and CEO Brian Hotarek publicly said BI-LO "achieved

---

[9] The Amended Complaint does not specify which company's business plan this was, though the implication is that it was Bruno's.

many milestones" to reposition its business, including the recent "spin-off of Bruno's, which allow[ed] BI-LO to focus on [its] brand and [its] customers." (*Id.* ¶ 47.) However, Lone Star was ultimately unable to sell BI-LO and pulled it off the market later that year.

H.    Allegations of Lone Star's Continued Control of Bruno's After the Spin-Off

After the Spin-Off, the directors and officers of Bruno's and BI-LO continued to overlap, and several of them were still employed by Lone Star. On March 12, 2007, Marc Lipshy, as Vice President of BI-LO, signed the appointment of Defendants Allen, West, and Hotarek to Bruno's board of directors. On the same day, the newly appointed board—West, Allen, and Hotarek—unanimously approved Bruno's conversion to an LLC and appointed Hotarek, Carney, Jones, Lipshy, and LeBaron as officers upon conversion. Bruno's LLC Agreement identified LSF5 Bruno's Investments, LLC as Bruno's managing member. Lipshy, who was LSF5 Bruno's Investments's Vice President—as well as an executive of Lone Star, Bruno's, and BI-LO—signed for almost every corporate action taken by LSF5 Bruno's Investments.

Although Bruno's corporate offices were moved back to Alabama, BI-LO continued to provide most of Bruno's corporate functions after the Spin-Off. Under a March 25, 2007 Transition Services Agreement, signed by Hotarek as President and CEO of both BI-LO and Bruno's,[10] BI-LO provided, for a fee, cash management, legal, human resources, and IT functions for Bruno's. Between March 2007 and mid-2008, BI-LO collected approximately $7.93 million under the Transition Services Agreement. As BI-LO's Executive VP and CFO, Carney negotiated with Bruno's officers regarding these fees for those services, while serving as an officer of Bruno's. Although the Transition Services Agreement provided that these fees were to be paid by LSF5 Bruno's Investments, they were paid by Bruno's. The Trustee alleges

---

[10] The renewals dated September 21, 2007 and December 20, 2007 were signed by Lipshy as Vice President of LSF5 Bruno's Investments while he was also serving as an officer of Bruno's and BI-LO. The renewal dated March 19, 2008 was signed by Lipshy as Vice President for both BI-LO and Bruno's.

that these fees were excessive and were disproportionate to BI-LO's actual cost to provide the services.

LSF5 Bruno's Investments also entered into an Asset Advisory Agreement with Hudson Advisors, an affiliate of Lone Star. Lipshy signed the Asset Advisory Agreement as Vice President of LSF5 Bruno's Investments, while also serving as an officer for both Bruno's and Hudson Advisors. Under the terms of the Asset Advisory Agreement, LSF5 Bruno's Investments was to pay Hudson Advisors for certain "asset management services" for Bruno's. Actually, Bruno's paid these fees. David West forwarded Hudson Advisors invoices owed by LSF5 Bruno's Investments to Brian Carney and Kent Moore, instructing them to process the payments to Hudson Advisors from Bruno's.

BI-LO also continued to receive cash payments from Bruno's—payments the Trustee alleges Bruno's was reliant on for continued operations. According to BI-LO's financial statements, Lone Star guaranteed repayment of the cash advances provided to Bruno's by BI-LO.[11] The Amended Complaint claims that BI-LO's accountants would not assign any value to the loans without such a guarantee because they deemed the loans uncollectable due to Bruno's financial condition. From late 2007 through late 2008, Bruno's transferred a total of $198,719,193 to BI-LO in repayment of these advances. The Trustee alleges, upon information and belief, that BI-LO transferred Bruno's payments to Lone Star and its affiliates.

Bruno's also transferred $3 million to LSF5 Affiliate Finance Co. Ltd, an affiliate of Lone Star, purportedly in repayment of a June 11, 2007 loan (the "Affiliate Finance Transfer"). The Trustee also alleges, again upon information and belief, that these funds were transferred to Lone Star or to another entity for Lone Star's benefit.

---

[11] LSF V International Finance, L.P. provided the guarantee for the benefit of Lone Star. Lone Star and LSF V International Finance, L.P. share the same general partner—Lone Star Partners V, L.P. The general partner of Lone Star Partners V, L.P. is Lone Star Management Co. V, Ltd., and Lipshy is the Vice President of that company.

I.       The Aftermath of the Spin-Off

In April 2007, one month after the Spin-Off, Bruno's had operating losses of $12,645,000.  By December 2007, Bruno's operating losses were $20,788,000.  Bruno's still owed BI-LO millions for unsecured advances, and Lone Star would have been obligated under its guarantee agreement with BI-LO for any unpaid amounts if Bruno's had filed for bankruptcy.[12]

1.       *The Regions Bank Loan*

From January 2008 through July 12, 2008, Bruno's lost $15,518,000, and July forecasts projected a total operating loss of $47,756,000 for 2008.  On July 28, 2008, Bruno's closed a $20 million revolving secured credit facility with Regions Bank (the "Regions Bank Loan").  Bruno's directors at the time, Allen and West, approved the Regions Bank loan by unanimous written consent without a special meeting,[13] and Moore signed the Loan and Security Agreement with Regions Bank.  The loan ended Bruno's need for more advance money loans from BI-LO and allowed Bruno's to repay the loan balance to BI-LO, which Lone Star had guaranteed.  Immediately following the close of the Regions Bank Loan, Bruno's caused Regions Bank to wire BI-LO $9,352,000 to satisfy unsecured advances made to Bruno's,[14] and Lone Star was in turn relieved of over $9 million in guarantee obligations on debt owed by Bruno's.

2.       *The In Line Transaction*

Two sale-leaseback transactions with In Line Investments, LLC, an affiliate of Lone Star, were made in conjunction with the Regions Bank Loan.  Marc Lipshy signed the Purchase and

---

[12] LSF V International Finance, L.P., Lone Star Partners V, L.P. and Lone Star Management Co. V, Ltd. were also liable under this guarantee.
[13] Defendant Lipshy provided consent for LSF5 Bruno's Investments, LLC for the Regions Bank loan.
[14] The Disbursement Letter dated July 28, 2008 was signed by Moore as President and CEO of Bruno's.

Sale Agreements for both In Line Investments and Bruno's.[15]  Bruno's paid approximately $533,328 for lease obligations incurred as a result of the In Line Transaction, tendering that sum to Hudson Advisors for In Line Investment's benefit.  Additionally, the $8 million in sale proceeds was immediately transferred from Bruno's to BI-LO to repay cash advances.

J.      Bruno's Decline

After the Regions Bank Loan, Bruno's continued to operate at a loss.  Bruno's sold pharmacy assets to CVS in October 2008 and sold several tracts of land in August and November 2008.  Bruno's was in default of the Regions Bank Loan no later than October 4, 2008, having failed to achieve EBITDA requirements.  Region's Bank notified Bruno's on November 19, 2008 that it was in default of the loan agreement, and Bruno's entered into a Forbearance Agreement with Regions Bank on November 26, 2008.  On February 5, 2009, Bruno's filed for Chapter 11 bankruptcy protection.

## II.     Motions Before the Court

Currently before the Court are three motions to dismiss.  The first, filed by the Lone Star Defendants, moves to dismiss only the claims related to the Cardinal Transaction, which consist of fraudulent transfer claims under the Alabama Uniform Fraudulent Transfer Act ("AUFTA") and claims for breach of fiduciary duty against all of the Individual Defendants.  All of the Defendants have joined in the Lone Star Motion.  The second Motion, filed by the BI-LO–Bruno's Defendants, and the third Motion, filed by the Bruno's Officer Defendants, seek to dismiss the fiduciary duty claims against the BI-LO–Bruno's Defendants and the Bruno's Officer Defendants, respectively.

---

[15] Lipshy also signed the lease agreement as President of In Line Investments, LLC while at the same time serving as Vice President of Bruno's.  Lipshy also provided approval for the sale-leasebacks by signing the written consent of Bruno's sole member, in lieu of a special meeting, as Vice President of LSF5 Bruno's Investments, LLC.

Also before the Court is a motion by the Trustee, seeking to strike, or at least prevent the Court from considering, the four exhibits attached to the Lone Star Defendants' Motion to Dismiss.

## ANALYSIS

The Trustee's Motion to Strike raises the question of whether the Court may consider documents outside the Amended Complaint in deciding the Defendants' Motions to Dismiss. The Court thus considers the Motion to Strike first, and then turns to the Motions to Dismiss in light of what materials are properly before it.

## I.     Motion to Strike

The Lone Star Defendants attached four exhibits to their Motion to Dismiss.  The first is the William Blair Report, which is cited extensively in the Amended Complaint.  The other three documents are affidavits filed in Bruno's bankruptcy case that the Trustee references in the Amended Complaint.  The Lone Star Defendants request that the Court incorporate these documents into the Amended Complaint so the Court may consider them in deciding their Motion to Dismiss.  Alternatively, the Lone Star Defendants request that the Court take judicial notice of the three affidavits.

In his Objections to and Motion to Strike Exhibits, the Trustee requests that the Court strike the exhibits attached to the Lone Star Defendants' Motion, refuse to consider the William Blair Report or the affidavits in ruling on the Motion to Dismiss, and decline to take judicial notice of the affidavits.  In the alternative, the Trustee argues that if the Court does consider the exhibits, it should convert the Motion to Dismiss to a motion for summary judgment, give notice of same, and allow for further discovery.

Generally, in considering a motion to dismiss under Rule 12(b)(6), the Court "must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). If the Court is presented with matters outside the pleadings and does not exclude them, "the motion must be treated as one for summary judgment [and] . . . [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). However, the Fifth Circuit has recognized "one limited exception" to this rule. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Under that exception, "'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'"[16] *Collins*, 224 F.3d at 498–99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.3d 429, 431 (7th Cir. 1993)). Thus, for a document to be incorporated into the pleadings under this exception, it must (1) be attached to a defendant's motion to dismiss, (2) be referred to in the plaintiff's complaint, and (3) be central to the plaintiff's claims. It is undisputed that the first two elements are met here, as all four documents were attached to the Lone Star Defendants' Motion to Dismiss and were referred to in the Amended Complaint. Thus, the question is whether the documents are central to the Trustee's claims.

Although the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the

---

[16] This exception is a natural extension of Rule 10(c), which states that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Because such documents are considered part of the pleadings, they are not "matters outside the pleadings" that trigger conversion to a motion for summary judgment under Rule 12. *See* Fed. R. Civ. P. 12(d).

plaintiff's claim. *See Katrina Canal Breaches Litig.*, 495 F.3d at 205; *Collins*, 224 F.3d at 499. For instance, in *Collins v. Morgan Stanley Dean Witter*, in which the Fifth Circuit first approved of the exception, the court held that the district court properly considered a contract and an investment bank's fairness opinion of a potential merger between two companies in order to determine whether the plaintiff stock-option holders were third-party beneficiaries of the contract. 224 F.3d at 499; *see Collins v. Morgan Stanley Dean Witter*, 60 F. Supp. 2d 614 (S.D. Tex. 1999). Likewise, in *In re Katrina Canal Breaches Litigation*, the court upheld the district court's consideration of the insurance contracts that formed the basis of the plaintiffs' claims. 495 F.3d at 205.

However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536–37 (5th Cir. 2003). In *Scanlan v. Texas A&M University*, the Fifth Circuit reversed the district court's decision to incorporate documents into the complaint. *Id.* at 537. There, the district court relied on a special commission's report in dismissing claims arising out of the injury and death of several students during the Texas A&M University bonfire disaster. *Id.* The Fifth Circuit held that "the report alone [was] not central to [the plaintiffs'] claims . . . [because] [t]he plaintiffs rel[ied] on substantial, other evidence to support their claims." *Id.* at 537.

Here, the William Blair Report is not central to the Trustee's claims because it is not necessary to establish an element of any of his claims but is merely one piece of evidence that the he relies on to support his allegations. Unlike a breach of contract case, in which the contract is itself a fact that the plaintiff must prove, the Trustee could conceivably prove Bruno's insolvency at trial without ever mentioning the William Blair Report. That the Amended

Complaint relies heavily on the Report does not change this fact. The Report may be the only source of information available to the Trustee at this stage of the proceedings, but that does not make the Report necessary for demonstrating insolvency. For the same reasons, the affidavits are not central to the Trustee's claims, but only evidence cited in the complaint.

Nothing in *Walch v. Adjunct General's Department of Texas* dictates a different result. 533 F.3d 289 (5th Cir. 2008). There, the Fifth Circuit referred to "discharge letters" in its analysis of the plaintiff's wrongful-discharge claims "in order to portray accurately the nature of [the plaintiff]'s claims and the procedural posture of [the] case." *Id.* at 294. The court held that its "reference to the discharge letters [was] consistent with [its] precedents . . . because both documents may [have been] considered under a Rule 12(b)(6) analysis." *Id.* However, the documents in *Walch* were not attached to the defendant's motion to dismiss, but were "expressly referenced in the complaint, acknowledged in the answers, *and attached to [the plaintiff]'s opposition to the Defendants' motions to dismiss.*" *Id.* (emphasis added). *Walch*, then, does not present a situation where a defendant attempts to add to or contradict the facts pleaded by the plaintiff in order to support a motion to dismiss, but instead involves a plaintiff who voluntarily supplemented his own pleadings in his response to the defendant's motion. The Court does not read *Walch* as an expansion of the "limited exception" recognized in *Collins* and reinforced in *Scanlan*; rather, the Court reads *Walch* as presenting an entirely different situation that is not applicable to the facts here.

*Causey v. Sewell Cadillac-Chevrolet, Inc.* is similarly distinguishable. 394 F.3d 285 (5th Cir. 2004). There, the plaintiff sued a car dealership, Sewell, and the car manufacturer, GM, for racial discrimination he allegedly suffered while attempting to have his vehicle serviced at Sewell. *Id.* at 287. GM filed a Rule 12(b)(6) motion to dismiss, and attached to it documents

showing there was no agency relationship between GM and Sewell. *Id.* at 290. On appeal, the

Fifth Circuit noted that "[w]hen the district court granted GM's motion, it did not state whether it

was doing so under Rule 12(b)(6) or Rule 56(c)." *Id.* The court held that the fact GM submitted

documentary evidence in support of its agency argument "[did] not clarify under which standard

this court should review the dismissal because the documents at least arguably relate to [the

plaintiff's] complaint by explaining the relationship between Sewell and GM." *Id.* (citing

*Collins*, 224 F.3d at 498–99). The court then extensively analyzed its prior opinion in *Arguello*

*v. Conoco, Inc.*, 207 F.3d 803 (5th Cir. 2000), in which the court had affirmed *summary*

*judgment* for Conoco on similar agency grounds. Based entirely on its analysis of *Arguello*, the

*Causey* court held that the district court did not err in dismissing the plaintiff's claims against

GM. *Causey*, 394 F.3d at 290.

       At most, *Causey* stands for the uncontestable point that a district court's reliance on

extra-pleading documents does not conclusively show whether the district court analyzed the

motion as one for summary judgment or one seeking dismissal. *Causey* does not mean, however,

that any document tending to disprove one of the plaintiff's claims may be considered by the

court without converting the motion into one for summary judgment and thereby giving the

plaintiff the opportunity to respond with its own evidence. To the extent that *Causey* did so hold,

the Court is bound to follow the Fifth Circuit's earlier decision in *Sclanlan*, which plainly

prohibits district courts from incorporating documents that are mere evidence for the defense.

*See Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 n.8 (5th Cir. 2006) ("[W]here two previous

holdings . . . conflict the earlier opinion controls and is the binding precedent in this circuit.").

       Because the exhibits attached to the Lone Star Defendants' Motion to Dismiss are not

central to the Trustee's claims, the Court will not incorporate them into the Amended Complaint.

However, as with all of the Trustee's well-pleaded factual allegations, the Court will accept as true the allegations concerning the contents of the William Blair Report.[17] Furthermore, the Court declines to consider the exhibits as matters outside the pleadings necessitating converting the Motion into one for summary judgment. In these respects, the Trustee's Motion is **GRANTED**.

As a purely procedural matter, however, the Court will not *strike* these exhibits. Rule 12 permits the Court to "strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). Rule 12(f) applies only to pleadings, not to other filings or documents. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 n.6 (3d ed. 1998 & Supp. 2010) (citing cases). Thus, the Court will *exclude* the documents from its consideration of the Lone Star Defendants' Motion to dismiss, but to the extent the Trustee seeks by his Motion to *strike* these exhibits, the Motion is **DENIED**.

In addition to requesting that all of the exhibits be incorporated into the Amended Complaint, the Lone Star Defendants request that the Court take judicial notice of the three affidavits from Bruno's bankruptcy case.

In deciding a Rule 12(b)(6) motion to dismiss, the Court may consider matters of which it may take judicial notice. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996); *see* Fed. R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding."). Federal Rule of Evidence 201 permits courts to take judicial notice of an "adjudicative fact" if the fact "is not subject to reasonable dispute in that it is (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

---

[17] If the Defendants believe the Trustee has misrepresented the contents of the Report, the proper mechanism for making such an assertion is a motion for sanctions under Rule 11.

sources whose accuracy cannot be questioned." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998). Accordingly, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). Furthermore, "'a court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings,' but 'cannot take notice of the factual findings of another court.'" *SB Int'l, Inc. v. P.R. Jindal*, No. 3:06-cv-1174-G, 2007 WL 1411042, at *1 (N.D. Tex. May 14, 2007) (Fish, C.J.) (quoting *Taylor*, 162 F.3d at 829). Nevertheless, the court should only take judicial notice of facts "'sparingly at the pleadings stage.'" *Reneker v. Offill*, No. 3:08-cv-1394-D, 2010 WL 1541350, at *5 (N.D. Tex. Apr. 19. 2010) (Fitzwater, C.J.) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007)). Thus, "'[o]nly in the clearest cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point.'" *Id.* (quoting *Victaulic*, 499 F.3d at 236).

When a court takes judicial notice of public documents or documents from another court, it may only take notice of the undisputed facts therein, which do not include the "facts" asserted in various affidavits and depositions. *See Anderson v. Dall. Cnty.*, No. 3:05-cv-1248-G, 2007 WL 1148994, at *4 (N.D. Tex. Apr. 18, 2007) (Fish, C.J.). Thus, when the court in *Anderson v. Dallas County* was asked to take judicial notice of all of the documents produced in a different lawsuit—documents that primarily consisted of affidavits, deposition testimony, and medical records—the court declined to do so because "the myriad of 'facts' contained in [those] documents [were] neither generally known nor reasonably indisputable." *Id.*

Similarly, the existence of such documents is an undisputed fact, even if their contents generally are disputed. In *SB International v. P.R. Jindal*, the defendant requested that the court take judicial notice of several state court pleadings. No. 3:06-cv-1174-G, 2007 WL 1411042, at

*2 (N.D. Tex. May 14, 2007) (Fish, C.J.).  The court held that "[i]f the defendant wishe[d] the

court to take judicial notice of the fact that these documents exist[ed] and were filed in the courts

shown on the first page of each document, that [wa]s within the court's power and the court

[would] take[] such notice."  *Id.*  However, to the extent the defendant requested that the court

take judicial notice of the *contents* of those documents, the court concluded that "any 'facts'

contained in the petitions, counterclaims, and motion are subject to reasonable dispute and,

therefore, not appropriate for judicial notice."  *Id.*

These holdings are consistent with *Lovelace v. Software Spectrum*, in which the Fifth

Circuit held that courts considering a Rule 12(b)(6) motion to dismiss a claim for securities fraud

may consider SEC-required public disclosure filings, but "only for the purpose of determining

what statements the documents contain, not to prove the truth of the documents' contents."  78

F.3d 1015, 1018 (5th Cir. 1996).

Here, the Lone Star Defendants submit that the exhibits to their Motion should be

judicially noticed only for determining what statements the documents contain.  With such

notice, the Court could, the Defendants argue, "correct an erroneous or misattributed quotation"

in the complaint, "determine the full meaning of a sentence that is only partially quoted," and

"consider[] the entire document to give context to statements selectively quoted from it."  (Lone

Star Defs.' Resp. 6, ECF No. 66.)  The Court agrees that it may take judicial notice of the

affidavits in order to determine what statements they contain, and hereby takes such notice.  The

Court is also inclined to agree that taking such notice would theoretically allow it to correct a

misquotation or misattribution of the statements in those documents.  But the Defendants do not

argue that an actual misquotation or misattribution has occurred here.  Instead, the Defendants

ask this Court to "give context" to the statements quoted from the affidavits in order to avoid

accepting "unwarranted factual inferences" from the Amended Complaint as true. This the Court will not do. At the pleadings stage, the Court accepts the Trustee's allegations as true, as well as all reasonable inferences therefrom. There are appropriate stages in the proceedings for the Defendants to introduce evidence challenging the reasonableness of such inferences, but this is not one of those stages.

Therefore, the Court takes judicial notice of the fact that the three affidavits exist, of the dates of their execution, and of the statements they contain, and the Trustee's Motion is **DENIED** to the extent it moves the Court not to do so. Nevertheless, the Court will not examine the affidavits in an attempt to test the reasonableness of the inferences suggested in the Amended Complaint. Such an approach would not be consistent with the "sparing" use of judicial notice that is appropriate at the motion to dismiss stage. On this point, then, the Trustee's Motion is **GRANTED**.

In summary, the Court declines to incorporate into the Amended Complaint the exhibits attached to the Lone Star Defendants' Motion to Dismiss. The Court takes judicial notice only of the existence of the three affidavits, and of what statements they contain. Finally, the Court will not strike any of the exhibits, as the Court's authority to strike filings applies only to pleadings. Therefore, the Trustee's Objections to and Motion to Strike Exhibits is **GRANTED** in part and **DENIED** in part.

## II.     Motions to Dismiss

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading standard Rule 8 announces does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

(citations omitted). While a court must accept all of the plaintiff's allegations as true, it is not bound to accept as true "a legal conclusion couched as a factual allegation." *Id.* at 1949–50 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief. *Iqbal*, 129 S. Ct. at 1950.

A.      Fraudulent Transfer Claim

Count VII of the Amended Complaint alleges that several of the challenged transactions were fraudulent transfers under the AUFTA. Of these claims, the Defendants move to dismiss only the fraudulent transfer claim challenging the Cardinal Transaction. For the reasons stated below, the Court holds that the Amended Complaint contains sufficient factual matter to plausibly suggest that the Cardinal Transaction was a fraudulent transfer under the AUFTA.

The Amended Complaint sets out two theories of fraudulent transfer liability under the AUFTA: "constructive" fraudulent transfer and "actual intent" fraudulent transfer. The Defendants argue that the Amended Complaint does not sufficiently state a claim under either theory.

Under the AUFTA's constructive fraudulent transfer provisions, a transfer made by a debtor is fraudulent as to a creditor if it is made without receipt of reasonably equivalent value in exchange for the transfer, and the debtor (a) was insolvent at the time or became insolvent as a result of the transfer; (b) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (c) intended to incur, or believed or reasonably should have believed that it would

incur, debts beyond its ability to pay as they became due.  Ala. Code. §§ 8-9A-4(c), -5(a) (West,

Westlaw through 2010 Spec. Sess.)  A transfer is fraudulent under the AUFTA's actual intent

provision if the debtor made the transfer with actual intent to hinder, delay, or defraud any of its

creditors, and the statute provides a non-exhaustive list of factors that may be considered in

determining a debtor's actual intent.  *Id.*  § 8-9A-4(a)–(b).

1.     Constructive Fraudulent Transfer

The Court first considers whether the Amended Complaint fails to sufficiently plead

constructive fraudulent transfer.  The Defendants contend that the Trustee's allegations are

insufficient as to every element of a constructive fraudulent transfer claim.

a.     Reasonably Equivalent Value

In order to establish a constructive fraudulent transfer, a creditor—or in this case the

Trustee—must show that the transfer was made for less than reasonably equivalent value.

Whether a debtor received reasonably equivalent value is to be determined in light of the

AUFTA's purpose—to protect creditors.  *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301

(5th Cir. 2007) (interpreting Texas's enactment of the UFTA).[18]  Accordingly, the value of

consideration given for an alleged fraudulent transfer is determined from the standpoint of the

debtor's creditors.  *See Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007)

(citing *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 643–44 (5th Cir. 2000) (interpreting

similar provision in the Bankruptcy Code)[19]).  Thus, "[t]he proper focus is on the net effect of the

transfer[] on the debtor's estate, the funds available to the unsecured creditors."  *Hinsley*, 201

F.3d at 644.

---

[18] The AUFTA directs courts to interpret the Act in light of its purpose to create uniform law, and thus cases
interpreting other states' enactments of the UFTA are pertinent.  Ala. Code § 8-9A-11; *see Fed. Land Bank Assoc. of
S. Ala., FLCA v. Cornelius & Salhab, R.P.*, No. H-09-3115, 2010 WL 3545406, at *7 (S.D. Tex. Sept. 9, 2010).

[19] The UFTA took the phrase "reasonable equivalent value" from the Bankruptcy Code, and therefore courts
interpreting that phrase under the UFTA frequently cite Bankruptcy Code precedent.  *See Smith*, 365 B.R. at 666.

"Generally, a transferor receives less than reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party." *Smith*, 365 B.R. at 666. This is true even when the third party is the parent company of the debtor: "When the consideration for a transfer passes to the parent corporation of a debtor-subsidiary that is making the transfer . . . the benefit to the debtor may be presumed to be nominal, absent proof of specific benefit to the debtor itself" *Id.* at 667. Thus, while "[c]ourts are willing to consider indirect benefits received by a debtor," they will do so "only if those benefits are fairly concrete." *Id.* (internal quotation omitted).

Here, the Trustee's factual allegations regarding the Cardinal Transaction plausibly show that Bruno's did not receive reasonably equivalent value for the real property transferred to Cardinal. The Amended Complaint alleges that Bruno's engaged in property sale-leaseback transactions with Cardinal, and that pursuant to these transactions, Bruno's sold Cardinal twelve properties but received none of the $60,290,342 in proceeds, all of which was allegedly "pocketed" by Lone Star. Taken as true, these allegations allow the Court to draw a reasonable inference that Bruno's did not receive reasonably equivalent value in exchange for the properties it transferred to Cardinal.

The Defendants argue, however, that these allegations suggest at most the *possibility* of liability because there are no allegations of the value of any other benefits that flowed to Bruno's from the Cardinal Transaction. That Bruno's received such other benefits is, the Defendants argue, an "obvious alternate explanation" for the facts alleged because the Cardinal Transaction was part of a "broader package of reorganization" meant to benefit Bruno's and BI-LO, both of which Lone Star purchased shortly before the Cardinal Transaction.

While it is conceivable that the Cardinal Transaction could have resulted in Bruno's receiving valuable benefits other than the sales proceeds, the Amended Complaint need not account for every possible collateral benefit in order to show that the Trustee is plausibly entitled to relief. The Trustee alleges that property was transferred from Bruno's to Cardinal, and that in return, Cardinal tendered roughly $60 million, all of which went to Bruno's parent company, Lone Star. In such a situation, the Court presumes any collateral benefits to Bruno's to be nominal. The Trustee need not account for them at the pleading stage.

  b.  Insolvency, Undercapitalization, and Intent to Incur Debts

In addition to the reasonably-equivalent-value requirement, in order to state a claim for fraudulent transfer under the AUFTA, the Trustee must plead that the debtor (1) was insolvent at the time or became insolvent as a result of the transfer; (2) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (3) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

  *i.  Insolvency under the AUFTA*

Under the first alternative, the Trustee must plead that Bruno's was insolvent at the time of the Cardinal Transaction or became insolvent as a result of it.

Under the AUFTA, a debtor is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Ala. Code § 8-9A-2(a).[20] The fair value of a debtor's assets is determined by "estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions." *Orix Credit Alliance, Inc. v. Harvey (In re Lamar*

---

[20] The AUFTA also provides that a debtor is presumed to be insolvent if it is "not paying [its] debts as they become due," Ala. Code § 8-9A-2(b), but the Amended Complaint contains no allegations implicating this presumption regarding the Cardinal Transaction.

*Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994).[21]  If the debtor was a going concern at the time of the transfer, courts look to "the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re DAK Indus., Inc.*, 170 F.3d 1197, 1199–1200 (9th Cir. 1999)).

As an initial matter, the parties dispute whether a basic allegation of insolvency—e.g., that the debtor "was insolvent," or that "the debtor's liabilities were greater than its assets at a fair valuation"—is sufficient to allege insolvency, or whether such basic allegations are legal conclusions or "formulaic recitation of the elements" that should not be accepted as true, thus requiring a plaintiff to allege factual detail about the state of the debtor's finances at the time of the disputed transfer.  The Defendants and the Trustee both cite post-*Twombly* bankruptcy court opinions supporting their arguments.

Although the parties pose an interesting question about pleading insolvency, it is not one the Court needs to answer because even if the Trustee were required to allege financial details in order to sufficiently plead his insolvency-based AUFTA claim, the Amended Complaint passes muster.  The Amended Complaint alleges that just prior to Lone Star's acquisition of Bruno's, BI-LO and Bruno's were reliant on financial support from their owner Ahold to continue operations.  The Amended Complaint further alleges that the William Blair Report, which the Trustee alleges was prepared based on Bruno's 2005 financial data, states that BI-LO would sell for $100–500 million more as a stand-alone entity than it would as a combined entity with Bruno's.  Further, according to the Amended Complaint, the Report states that the chances of

---

[21] As with the reasonably equivalent value requirement, courts interpreting the UFTA's definition of insolvency often rely on cases interpreting the Bankruptcy Code's almost identical definition.  *See, e.g., Randall v. Erstmark Capital Corp. (In re Erstmark Capital Corp.)*, 73 Fed. App'x 79, 2003 WL 21756460, at *2 (5th Cir. 2003); *Waller v. Pidgeon*, No. 3:06-cv-0506-D, 2008 WL 2338217, at *5 n.7 (N.D. Tex. June 5, 2008) (Fitzwater, C.J.).

selling BI-LO with Bruno's attached were severally limited and that the dilutive effects of Bruno's were "clear."

Taken as true, these allegations plausibly show that Bruno's had liabilities in excess of the fair value of its assets at the time of the Cardinal Transaction. That the William Blair Report concluded BI-LO would have garnered a higher price without Bruno's creates plausible grounds to infer that Bruno's market value, as a going concern, was negative. Although the Blair Report was prepared in March 2006, it allegedly was based on Bruno's 2005 financial data. Furthermore, given the allegations concerning Bruno's poor financial condition in January 2005, it is reasonable to infer that the "dilutive effects" of Bruno's were not a recently occurring condition in March 2006, but one that existed in June 2005 when the Cardinal Transaction occurred.

The Defendants argue that the Amended Complaint draws unwarranted inferences from the William Blair Report.[22] First, the Defendants contend that BI-LO was worth more alone than combined with Bruno's not because Bruno's was insolvent, but because certain characteristics of Bruno's made it difficult to integrate its operations into those of BI-LO, or those of many other supermarkets. Thus, the Defendants argue, Bruno's dilution of BI-LO's sale price was caused by the lack of synergies between Bruno's operations and those of potential buyers. But this argument purports to explain *why* Bruno's was not a desirable acquisition. Even if true, it does not diminish the central import of the Trustee's allegations—that potential buyers of BI-LO would pay more to avoid acquiring Bruno's.

---

[22] In support of this argument, the Defendants cite to portions of the William Blair Report that were not recounted in the Amended Complaint, portions that they claim contradict the Amended Complaint's allegations regarding the contents of the Report. The Court has declined to consider the Report in deciding Defendants' Motions, and thus it will not consider arguments that rely on the actual contents of the Report. However, the Court considers Defendants' arguments to the extent they can be construed to contend that the portions of the William Blair Report cited in the Amended Complaint do not support an inference of insolvency.

Insolvency is not the only financial condition that can give rise to a fraudulent transfer claim under the AUFTA.  A transfer for which the debtor received less than reasonably equivalent value will also be fraudulent if it was made while the debtor was engaged or was about to engage in a business or transaction for which the debtor's remaining assets were unreasonably small in relation to the business or transaction.  This measure is sometimes called "undercapitalization," and refers to a debtor's "inability to generate sufficient profits to sustain operations."  *ASARCO, LLC v. Ams. Mining Corp.*, 396 B.R. 278, 396 (S.D. Tex. 2008)).  The undercapitalization measure is "aimed at transferees that leave the transferor technically solvent but doomed to fail."  *Id.* (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992)).  When determining, as a matter of fact, whether a corporate debtor has unreasonably small assets, courts often compare the debtor's projected cash flow with its capital needs through a reasonable time after the challenged transfer, and determine whether the debtor's projections were prudent when made.  *See ASARCO*, 396 B.R. at 396–97.

Although the ultimate factual determination of whether Bruno's was undercapitalized at the time of the Cardinal Transfer likely will involve a detailed analysis of cash-flow estimates and capital requirements, the Trustee need not plead such an analysis in order to survive a motion to dismiss.  According to the Amended Complaint, the William Blair Report found that Bruno's was in need of significant capital investment and $67 million in capital improvement.  Furthermore, the Amended Complaint cites the Report's assessment that Bruno's had a history of negative operating performance that could only be reversed with significant investments of time, capital, and money.  These allegations, when considered in combination with the allegation that Bruno's was completely reliant on its corporate parent just months before the Cardinal

transaction, support a reasonable inference that Bruno's had an inability to generate sufficient profits to sustain operations at the time of the Cardinal Transaction.

The Defendants argue that undercapitalization is not sufficiently pleaded because the Amended Complaint does not contain any "undercapitalization factors such as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry." As just mentioned, these factors are the type of *evidence* courts consider when determining, *as fact finders*, whether a debtor was undercapitalized. At this stage, however, the Trustee need only demonstrate that he is plausibly entitled to relief—he is not required to prove his case in the pleadings.

In a similar vein, the Defendants argue that the fact Bruno's continued to operate for over three years after the Cardinal Transaction demonstrates it was adequately capitalized at the time of the Cardinal Transaction. Courts often consider the length of time the debtor survives after a challenged transaction in determining adequate capitalization, because the length of that interval generally is pertinent evidence of the sufficiency of the debtor's assets. *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 795 (7th Cir. 2009). However, "[a]n inadequately capitalized company may be able to stagger along for quite some time," and thus, even an interval of three years will not create a presumption of adequate capitalization. *Id.* at 795 (upholding the district court's finding of inadequate capital where the debtor failed three years after the challenged transaction). According to the Amended Complaint, Bruno's defaulted on loan obligations three years after the Cardinal Transaction, and filed for bankruptcy four months after that. While an interval of such length may provide the Defendants with persuasive evidence in later proceedings, it is not enough to render the Trustee's allegations implausible.

*iii.    Intent to incur debts*

In addition to insolvency and undercapitalization, a transfer lacking reasonably equivalent value is constructively fraudulent if the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.  In their Motion to Dismiss, the Lone Star Defendants argue that the Amended Complaint does not attempt to allege this circumstance in 2005.  The Trustee's Response does not address this argument, and it was not addressed at the hearing.  The Court agrees with the Defendants that this element is not alleged in connection with the Cardinal Transaction.  The Amended Complaint contains no allegations about any debts that Bruno's incurred or intended to incur in connection with the Cardinal Transaction.  To the extent the Trustee intended to allege a claim based on this element, he has failed to sufficiently plead it.

2.      Actual Intent Fraudulent Transfer

Under the AUFTA's actual intent fraudulent transfer provision, a transfer is fraudulent "if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor."  Ala. Code § 8-9A-4(a).  The statute further provides as follows:

In determining actual intent under subsection (a), consideration may be given, among other factors, to whether:

(1) The transfer was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer was disclosed or concealed;

(4) Before the transfer was made the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* § 8-9A-4(b). These factors are commonly known as the badges of fraud. Because proof of "actual intent to hinder, delay, or defraud" creditors may rarely be accomplished by direct proof, courts may infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions. *Dionne v. Keating (In re XYZ Options)*, 154 F.3d 1262, 1271 (11th Cir. 1998). In determining whether the circumstantial evidence is sufficient to establish fraudulent intent, the court should investigate the transfer for the existence of badges of fraud. *Id.* However, "'actual fraudulent intent requires a subjective evaluation of the debtor's motive.'" *Premier Capital Funding, Inc. v. Earle (In re Earle)*, 307 B.R. 276, 293 n.9 (Bankr. D. Ala. 2002) (quoting *In re Jeffrey Design Grp.*, 956 F.2d 479, 484 (4th Cir. 1992)).

The Defendants argue that absent from the Amended Complaint are allegations that Bruno's conducted the Cardinal Transaction with intent to defraud creditors, or that any of the badges of fraud indicated such intent.[23] In response, the Trustee argues that it has alleged "multiple" badges of fraud. Specifically, the Trustee points to the allegations that "Lone Star caused the insolvent Bruno's to transfer the proceeds of the sale of a large

---

[23] Although the subject of dispute, some courts have held that claims for actual intent fraudulent transfer are, in some circumstances, subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b). *See Alexander v. Holdren Bus. Forms, Inc.*, No. 4:08-cv-614-Y, 2009 WL 2176582, at *3 (N.D. Tex. July 20, 2009) (Means, J.). Here, Defendants only challenge the Trustee's allegations under the general pleading standard of Rule 8, so the Court does not examine whether Rule 9 applies to the Trustee's claims.

portion of Bruno's assets ($60 million worth of property) to an insider without receiving reasonably equivalent value of the assets transferred."  (Pl.'s Resp. 8.)

The Trustee's allegations implicate three of the badges of fraud: (1) the transfer was to an insider; (8) the debtor received less than reasonably equivalent value; and (9) the debtor was insolvent.  Taken as true, these allegations are sufficient to support an inference that Bruno's had the actual intent to defraud, hinder, or delay its creditors when it sold twelve properties to a third party and allowed Lone Star to keep the proceeds.

3.      Conclusion—Fraudulent Transfer

The Amended Complaint plausibly alleges constructive fraudulent transfer claims regarding the Cardinal Transaction because it sufficiently alleges (1) that Bruno's received less than reasonably equivalent value for the transfers; (2) that Bruno's was insolvent at the time of the transfer; and (3) that Bruno's was undercapitalized at the time of the transfer.  Furthermore, the claims for actual intent fraudulent transfer are sufficiently pleaded because the Amended Complaint alleges the presence of multiple badges of fraud.

B.      Breach of Fiduciary Duty Claims

Counts I and II of the Amended Complaint allege that the Individual Defendants and LSF5 Bruno's Investments breached their fiduciary duties of care and loyalty to Bruno's by their participation in the various transactions described in the Amended Complaint.

Directors and officers of a Delaware corporation owe fiduciary duties to the corporation. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). When the corporation is solvent, these duties run to the shareholders "'because they are the ultimate beneficiaries of the corporation's growth and increased value.'" *Torch Liquidating*

*Trust v. Stockstill*, 561 F.3d 377, 385 (5th Cir. 2009) (qoting *Gheewalla*, 930 A.2d at 101). It is

no surprise, then, that when a corporation is a wholly-owned subsidiary of a corporate parent, the

duties owed by the subsidiary's officers and board of directors run to the parent, as the parent is

the sole shareholder. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200

(Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007). Thus, when the subsidiary is solvent, its

"'directors . . . are obligated only to manage the affairs of the subsidiary in the best interests of

the parent and [the parent's] shareholders.'" *Id.* (quoting *Anadarko Petrol. Corp. v. Panhandle

E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)).

When a corporation becomes insolvent, however, the creditors become "'the principal

constituency injured by any fiduciary breaches that diminish the firm's value.'" *Gheewalla*, 930

A.2d at 101–02 (quoting *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 794 n.67 (Del.

Ch. 2004)). Accordingly, when a wholly-owned subsidiary is insolvent, the fiduciary duties

owed by its directors and officers no longer run just to the parent as sole shareholder, but also

run to the subsidiary's creditors. *See Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344

B.R. 283, 288 (Bankr. D. Del. 2006) ("There is no basis for the principle . . . that the directors of

an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent

corporation.").

The Defendants assert essentially three arguments for dismissal of the Trustee's breach of

fiduciary duty claims. First, the Defendants argue that the Amended Complaint does not

sufficiently allege Bruno's insolvency during certain time periods. Second, the Moving

Defendants argue that the Amended Complaint alleges harm to creditors, not to Bruno's, and

therefore does not actually assert claims on Bruno's behalf. Finally, the Moving Defendants

argue that the allegations concerning their individual involvement in the challenged transactions

are conclusory or overly vague and that the Amended Complaint fails to "plead around" the business judgment rule.

1.      Insolvency Under Delaware Law

As with the Trustee's fraudulent transfer claims, the Defendants argue that the Amended Complaint's allegations of insolvency at the time of the Cardinal Transaction are insufficient to plead a breach of fiduciary duty. Additionally, the BI-LO–Bruno's Defendants argue that the Amended Complaint fails to allege insolvency for any period of time prior to March 2007.

In order to determine whether the Amended Complaint sufficiently pleads insolvency for purposes of a claim for breach of fiduciary duty under Delaware law, the Court must identify the relevant definition of insolvency. As it turns out, this is no easy task. It is clear that Delaware courts employ both a balance sheet test—a comparison of assets to liabilities—and a cash flow test—the ability of a company to pay its debts—to determine insolvency for purposes of asserting fiduciary duty claims by creditors. It is equally clear that if a company is insolvent under either measure, the directors' and officers' fiduciary duties run to the benefit of creditors.

Delaware courts are consistent in holding that a company is cash flow insolvent if "it is unable to pay its debts as they fall due in the usual course of business." *U.S. Bank, N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*, 864 A.2d 930, 947 (Del. Ch. 2004), *vacated on other grounds*, 875 A.2d 632 (Del. 2005); *accord Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004). Yet discrepancies exist in Delaware case law regarding the test for balance sheet insolvency applicable to fiduciary duty claims. Some Delaware cases recite a test identical to that employed in the UFTA and the Bankruptcy Code: a company is insolvent if "it has liabilities in excess of a reasonable market value of assets held." *U.S. Timberlands*, 864 A.2d at 947; *accord Trenwick*, 906 A.2d at 195 n.74 ("Insolvency in fact occurs at the moment

when the entity has liabilities in excess of a reasonable market value of assets." (citations omitted)).

Other Delaware cases, however, cite a more demanding test, defining balance sheet insolvency as "a deficiency of assets below liabilities *with no reasonable prospect that the business can be successfully continued in the face thereof.*" *Prod. Res. Grp.*, 863 A.2d at 782 (emphasis added); *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, C.A. No. 1456-N, 2006 WL 2588971, at *10 (Del. Ch. Sept. 1, 2006), *aff'd*, 930 A.2d 92 (Del. 2007). Under this test, the fiduciary duties of directors and officers do not run to creditors, even when a company's liabilities exceed the fair market value of its assets, as long as other sources of funding are available to the company that allow it to continue operating successfully. *See Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Comm'ns Corp.)*, 392 B.R. 561, 600 (Bankr. D. Del. 2008).

The Delaware Supreme Court has alluded to the discrepancy, but has not provided any concrete guidance to resolve it. *Gheewalla*, 930 A.2d at 98 & n.18 (noting that the court of chancery below "opined" that the more stringent test applied, but then observing that two of the four cases the court of chancery relied upon for that proposition in fact applied the traditional formulation of the balance sheet test). Because the Amended Complaint sufficiently pleads insolvency under either standard, this Court does not opine as to which standard should apply.

As stated in the Court's discussion of the AUFTA claim, the Amended Complaint's allegations concerning Bruno's dilutive effect on the sale of BI-LO plausibly show that Bruno's liabilities exceeded the market value of its assets at the time of the Cardinal Transaction. Similarly, the same well-pleaded facts that support an inference of undercapitalization plausibly show that Bruno's business could not be successfully continued in the face of its insolvent

condition. Those allegations include the William Blair Report's findings that Bruno's was in need of significant capital investment in the amount of $67 million and had a history of negative operating performance that could only be reversed with significant investments of time, capital, and money.

Likewise, the Trustee has sufficiently pleaded insolvency at all relevant time periods after the Cardinal Transaction. The Amended Complaint alleges that Bruno's statement of operations showed a net loss of $30,432,000 for the year 2006, and that a balance sheet sent on November 8, 2006 to a potential purchaser of Bruno's showed total assets of $152,631,000 and total liabilities of $162,030,000—an excess of liabilities of $9,399,000. The Amended Complaint further alleges that this balance sheet did not include certain contingent factors that would be considered in a fair market valuation and would significantly reduce the value of Bruno's to any prospective buyer. Furthermore, according to the Amended Complaint, after Bruno's was spun off from BI-LO, its opening balance sheet as of March 29, 2007 demonstrated that Bruno's was insolvent on that day as well. Although the opening balance sheet actually showed Bruno's as having an equity value of zero, the Amended Complaint alleges that this was due to an unjustified reduction in the amount of negative goodwill ascribed to Bruno's. Had the much higher negative goodwill figure reported on Bruno's 2007 audited financial statements been included in the opening balance sheet, the Trustee claims it would have shown Bruno's to be balance sheet insolvent. Finally, the Amended Complaint alleges that Bruno's lost $30,719,000 in 2007.

In sum, the Amended Complaint alleges that Bruno's was insolvent in June 2005, operated at a loss in 2006 and 2007, and produced two balance sheets that both indicated Bruno's had liabilities in excess of its assets. Taken as true, these allegations create plausible grounds to

infer that, from the time of the Cardinal Transaction through March 2007, Bruno's remained insolvent, without a reasonable prospect of continuing successfully.

The Defendants contend that the Amended Complaint's reference to the November 2006 balance sheet does not plausibly suggest insolvency because the Trustee did not plead any facts indicating the relevant time period the balance sheet covers or whether goodwill was included in the table of assets. While these contentions may be useful in showing the balance sheet's deficiency as evidence at trial, they do not detract from the Trustee's *allegations* regarding the balance sheet that create plausible grounds to infer insolvency. In effect, the Defendants' argument is that the Trustee's allegations could also support the inference that the balance sheet understated Bruno's assets and was not current as of the date it was sent. While it is possible for the Defendants to show that Bruno's sent a prospective buyer an out of date balance sheet that *undervalued* its assets, such a possibility does not undermine the plausible inference suggested by the Trustee. The standard announced in *Twombly* and *Iqbal* does not create a bar so substantial that a complaint's allegations must exclude all possible inferences from the alleged facts.

Furthermore, the Amended Complaint sufficiently pleads insolvency even without reference to the balance sheet because it alleges that Bruno's was insolvent in June 2005 and sustained significant operating losses in 2006 and 2007. Only by assuming that Bruno's sporadically attained solvency just before each challenged transaction could one infer that Bruno's was not insolvent for that entire time period. Such an inference is not so compelling as to overcome the Trustee's plausible theory.

The Defendants' final challenge to the Trustee's insolvency allegations is based on simple arithmetic. If, as the Amended Complaint alleges, Bruno's was insolvent by almost $10

million in November 2006 and had suffered losses of about $30 million over that year, the Defendants argue that it is implausible that Bruno's was insolvent in June 2005. In other words, if Bruno's was only $10 million in the hole after losing $30 million dollars in 2006, Bruno's must have been about $20 million in the black before 2006. Had these been the facts alleged in the Amended Complaint, there might be something to this argument. But the Amended Complaint also alleges that the November 2006 balance sheet severely undervalued Bruno's liabilities by omitting certain contingencies that would be considered in a fair market valuation. That is, the Trustee does not allege that Bruno's was actually $10 million in the red, but rather that a balance sheet that omitted information significant to a fair going-concern valuation showed a $10 million deficiency of assets. Thus, the mathematical relationship between the asset deficiency shown in the balance sheet and the annual operating loss reflected in the statement of operations does not logically result in the conclusion urged by the Defendants—that Bruno's was solvent in 2005.

The Trustee has sufficiently pleaded that Bruno's was insolvent at the time of the challenged transactions. Therefore, taking the pleaded facts as true, Bruno's officers and directors owed fiduciary duties to the benefit of Bruno's creditors.

2.      Harm to Bruno's or Harm to Creditors

The Defendants next argue that the Trustee's allegations regarding many of the transactions allege harm solely to Bruno's creditors, rather than to Bruno's itself. Indeed, that directors' and officers' fiduciary duties run to creditors when a company is insolvent certainly does not mean that insolvency places the directors and officers in a fiduciary relationship with individual creditors—whether the corporation is insolvent or not, creditors never may assert direct claims against directors or officers for breach of fiduciary duty. *Gheewalla*, 930 A.2d at

102–03.  Improper acts of directors and officers "operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims."  *Id.* at 102.  Thus, a transaction that benefits one creditor to the detriment of another, but does not diminish the value of the company as a whole, does not give rise to a claim for breach of fiduciary duty.  *Id.* at 103 n.43; *see Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 791–92 (Del. Ch. 2004) ("[T]he mere fact that directors of an insolvent firm favor certain creditors over others of similar priority does not constitute a breach of fiduciary duty.").

The Defendants' initial argument is based on the presence in the Amended Complaint of several references to harm suffered by Bruno's creditors.  Of course, that a transaction caused harm to creditors does not foreclose the possibility that it caused harm to Bruno's—in fact, it makes it quite likely, as it is difficult to imagine that a transaction could harm an insolvent company without harming its creditors.  Nor is it relevant in this case that in several places the Amended Complaint differs from the Original Complaint only by naming Bruno's, rather than creditors, as the injured party, and a fair reading of *Torch*, on which the Defendants heavily rely, does not lead to a different conclusion.  *Torch Liquidating Trust v. Stockstill*, 61 F.3d 377 (5th Cir. 2009).  *Torch* stands for the uncontestable proposition that simply inserting a company name into a complaint does not transform a direct creditor claim into a claim on behalf of the company. *See id.* at 391.  But the inverse is just as true; alleging that a transaction harms "creditors," without referring to the company by name, does not create a direct creditor claim where the harm runs to the company.

Semantics notwithstanding, the Defendants also argue that a number of the transactions described in the Amended Complaint "actually brought liquidity into Bruno's," and "[we]re

nothing more than loans to Bruno's and repayment of those loans." (BI-LO–Bruno's Defendants' Mot. 16.) In other words, the Defendants argue that certain challenged transactions did not actually harm Bruno's. Although not referred to by name, the specific transactions implicated by the Defendants' briefing on this point are the Regions Bank Loan and the In Line Transaction.

The Regions Bank Loan, according to the Amended Complaint, consisted of Bruno's closing a $20 million revolving credit facility with Regions Bank, for which Bruno's granted Regions Bank a security interest in all of its assets. Shortly following the completion of the transaction, Bruno's allegedly transferred over $9 million to BI-LO in satisfaction of unsecured advance money loans made by BI-LO to Bruno's, which in turn relieved Lone Star of $9 million in guarantees it had made on Bruno's obligations to BI-LO. The Amended Complaint characterizes the Regions Bank Loan as follows:

> Bruno's went from having no secured debt ahead of its unsecured creditors to having all of its assets encumbered in order to repay BI-LO's unsecured loans and relieve Lone Star of guarantee obligations. Instead of liquidating the clearly insolvent company for the benefit of all creditors, Bruno's directors, officers, managers and managing member agreed to mortgage all of the company's assets in order to repay unsecured loans owed to an insider.

(Am. Compl. ¶ 54.)

The In Line Transaction allegedly consisted of two sale-leaseback transactions in which Bruno's transferred properties to In Line Investments in exchange for $8 million. The Amended Complaint alleges that that transaction caused Bruno's to incur $533,328 in lease obligations, and that almost immediately after the transaction was completed, Bruno's transferred the $8 million in sale proceeds to BI-LO in further repayment of advance money loans. In characterizing the transaction, the Amended Complaint alleges that, "[d]espite the company's continued operating losses, undercapitalization and insolvency, Bruno's directors, officers,

managers and managing member agreed to repay unsecured debt to an insider by transferring assets out of the company and incurring even more crushing lease obligations that they knew could never be repaid." (Am. Compl. ¶ 55.)

At the outset, the Court recognizes that these allegations focus in part on the preferential nature of the transactions; that is, that each transaction used property of Bruno's to repay loans provided by BI-LO, an insider by virtue of being a subsidiary of Bruno's parent, Lone Star. Despite the general rule that using company assets to pay off one creditor instead of another of similar priority does not alone cause harm to the company itself, the Trustee contends that preferring a creditor that is an insider can constitute a breach of fiduciary duty. In support of this contention, the Trustee cites *Production Resources Grp., L.L.C. v. NCT Grp., Inc.*, in which the Delaware Court of Chancery suggested in dicta that the general rule that a preference is not a breach of fiduciary duty "may not apply where the preferred creditor is an insider." 863 A.2d 772, 792 n.62 (Del. Ch. 2004).

Such an exception cannot be reconciled with the Delaware Supreme Court's subsequent decision in *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, which held without reservation that claims for breach of fiduciary duty against directors and officers of an insolvent company belong to the company itself and operate to vindicate actions that harm the company by reducing its value. 930 A.2d 92, 102–03 (Del. 2007). A preference to an insider creditor of an insolvent company causes the company no greater harm than a preference to a non-insider creditor of similar priority. Such self-dealing may violate widely accepted notions of fairness and equity, but those types of considerations are of no consequence to the dollars and cents calculation of a company's value.

However, the Trustee complains not only of the fact that payment was made to insider creditors, but also that the Defendants allegedly "mortgaged all the company's assets" and "transferr[ed] assets out of the company" in order to make the payment. Separate from the issue of whether one creditor was preferred over all others, it is conceivable that the choice to use an insolvent company's assets to pay off debt at all may harm the company. For instance, if a company used available assets to pay off debt instead of taking advantage of a guaranteed investment opportunity whose rate of return was greater than the cost of the debt, that decision may harm the company itself. Similarly, the decision to use all available assets to pay off all of the debt owed to one creditor, while allowing several other debts owed to other creditors to go into default, may harm the company itself if the assets used could have kept all debts current had they been applied evenly. Certainly, several other scenarios can be imagined. But the Trustee has not alleged any facts demonstrating that such a situation existed here.

Even so, the Trustee still has sufficiently pleaded that the Regions Bank Loan and the In Line Transaction harmed Bruno's rather than just particular creditors. In connection with both transactions, the Amended Complaint alleges that the Defendants continued to operate a company that was losing money in order to use its assets for the benefit of its parent. In other words, the harm to Bruno's was not necessarily the amounts exchanged in these transactions, but rather was the operating losses Bruno's continued to sustain while the Defendants kept it in business long enough to pay off insider debts. Viewing these well-pleaded allegations in the light most favorable to the Trustee, the Amended Complaint sufficiently pleads harm to Bruno's from the Regions Bank Loan and the In Line Transaction.

To be clear, in finding that these allegations sufficiently allege harm to Bruno's, the Court in no way adopts a theory of "deepening insolvency"—a concept that has been rejected by

the Delaware Court of Chancery. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 204 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007). Absent allegations that some legal or equitable duty was breached, the fact that an insolvent business becomes more insolvent due to the actions of its directors and officers no more establishes a cause of action than the fact that a solvent company becomes less profitable. *Id.* at 205. What is clear, however, is that a deeper hue of red in the company's books is a harm suffered by the company itself, not only by particular creditors.

3.      Sufficiency of the Breach of Fiduciary Duty Allegations

Under Delaware law, the business decisions of a company's directors or officers are insulated from court review by the business judgment rule, which is a presumption that in making a business decision, the directors and officers "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009). A plaintiff challenging an officer's or the directors' decisions bears the burden of rebutting this presumption. *Id.* at 706; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). To rebut the presumption, the plaintiff must demonstrate that the officers or board of directors breached the duty of loyalty or the duty of care. *Gantler*, 965 A.2d at 706. If a plaintiff fails to rebut the presumption by showing a breach of either duty, then the decisions of officers and directors will not be disturbed unless they acted in a manner that cannot be attributed to a rational business purpose. *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). Thus, the mere fact that a decision made by an officer or authorized by directors turned out poorly and caused the company to suffer some loss, does not amount to a breach of fiduciary duty no matter how foolish that decision may appear in hindsight, unless the decision is outside the bounds of any rational business purpose. However, if the plaintiff rebuts

the presumption, the burden shifts to the defendant directors or officers to prove to the trier of fact the "entire fairness" of the transaction. *Cede*, 634 A.2d at 361.

The parties do not dispute these principles of Delaware law, but instead disagree about how they apply at the motion to dismiss stage.

The Defendants first argue that a plaintiff must "plead around" the presumption of the business judgment rule in order to withstand a motion to dismiss for failure to state a claim. If pleading around the rule is required, then in order to withstand the pending Motions to Dismiss, the Trustee not only must have alleged facts showing that the Moving Defendants' decisions or actions led Bruno's to suffer harm, but must also have alleged facts plausibly showing that those decisions or actions were the result of disloyalty or a lack of due care, or that their conduct cannot be attributed to a rational business purpose.

Delaware courts, applying Delaware procedural rules, require plaintiffs asserting claims for breach of fiduciary duty to make such allegations in order to withstand a motion to dismiss for failure to state a claim: "Procedurally, the plaintiffs have the burden to plead facts sufficient to rebut the [business judgment rule's] presumption. On a motion to dismiss [for failure to state a claim], the pled facts must support a reasonable inference that in making the challenged decision, the board of directors breached either its duty of loyalty or duty of care." *Gantler*, 965 A.2d at 705–06.

The Trustee disputes this position, relying on *In re Tower Air, Inc.*, in which the Third Circuit held that "[g]enerally speaking, [it] will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)," unless the affirmative defense appears on the face of the complaint. *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). The Trustee argues that the business judgment rule

does not appear on the face of the Amended Complaint, and therefore, that he need not have alleged facts from which the Court can reasonably infer that the presumption is rebutted.

The Court is not persuaded by the Trustee's argument. Delaware case law unambiguously holds that the plaintiff bears the burden of proof in rebutting the presumption of the business judgment rule. *E.g.*, *Cede*, 634 A.2d at 361. By definition, an affirmative defense is a defense that "[t]he defendant bears the burden of proving." *Black's Law Dictionary* (9th ed. 2009). Thus, describing the presumption created by the business judgment rule as an affirmative defense is, at best, a dubious characterization of the rule.

In *Tower Air*, the court observed that "Delaware courts consider Chancery Rule 8's specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species." *Tower Air*, 416 A.2d at 236–37. This led the Third Circuit to hold that "[t]he District Court [had] erred by assuming that Delaware's notice pleading cases are interchangeable with federal notice pleadings cases." *Id.* at 237. Even if this Court were to accept the conclusion that Delaware and federal courts interpret their textually identical notice pleading rules differently, a difference regarding the level of detail each requires of a plaintiff's factual allegations does not warrant relegating the business judgment rule to a defense that corporate directors and officers may successfully assert only after discovery. As one Delaware district court concluded, "[The] protections [of the business judgment rule] are a substantive point of law that . . . stands largely independent . . . of . . . the notice purpose inherent in procedural rules of pleading." *IT Group, Inc. v. IT Litig. Trust*, No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611, at *8 n.10 (D. Del. Nov. 15, 2005) (citations omitted).

An examination of *Tower Air*'s practical consequences further justifies not applying it here. Allowing plaintiffs to avoid the business judgment rule's effects by omitting any mention

of it from their pleadings provides plaintiffs "a powerful and perverse incentive to 'dummy-up' about the obvious implications of the business judgment rule when drafting their complaints in the first instance." *Id.* Thus, "because [*Tower Air*] sees a problem not when facts are omitted but only when they are presented, the predictable and unfortunate result will be deliberately obtuse allegations." *Id.* Such an outcome "truly bears scant resemblance to the operation of the business judgment rule in Delaware courts." *Id.*

Therefore, the Court declines to apply *Tower Air* here.[24] In order to state a claim for breach of fiduciary duty under Delaware law that is plausible on its face, a plaintiff must plead factual content that allows the court to draw the reasonable inference that in making the challenged decision, the directors or officers breached their duties of loyalty or care. *See Gantler*, 965 A.2d at 706. A plaintiff may not simply allege that a fiduciary "undertook a business strategy that was all consuming and foolhardy and that turned out badly and thereby seek to have the court infer that the later failure resulted from [a breach of the duties of care or loyalty]." *Trenwick*, 906 A.2d at 194. Such allegations are merely consistent with wrongdoing, and often have an obvious alternative explanation—that sometimes business strategies and decisions do not pan out despite the best intentions and the most exacting care.

However, the Court's analysis does not end here. The Trustee asserts that the allegations in the Amended Complaint are sufficient to rebut, or "plead around," the business judgment rule. Therefore, the Court must examine the allegations and determine whether they create plausible grounds to infer that the Moving Defendants violated their fiduciary duties of loyalty or care.

The duty of loyalty mandates that "the best interest of the corporation . . . takes precedence over any interest possessed by a director, officer or controlling shareholder and not

---

[24] Although the decisions of circuit courts interpreting the law of states within their jurisdictions may be persuasive, neither the Fifth Circuit nor district courts within it are bound by those decisions. *See Peters v. Ashcroft*, 383 F.3d 302, 306 n.2 (5th Cir. 2004).

shared by the [corporation] generally." *Cede*, 634 A.2d at 361. A breach of the duty of loyalty is usually established by showing that a fiduciary (1) was interested in the challenged transaction or (2) lacked independence to objectively consider whether the transaction was in the best interest of the corporation. *See Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 558 (D. Del. 2008). A director or officer is interested in a business transaction when he appears on both sides of the transaction or receives a personal benefit from it that is not received by the company generally. *Cede*, 634 A.2d at 362. A director or officer lacks independence if his decision is based on extraneous considerations or influences, rather than the corporate merits of a decision or action. *Orman v. Cullman,* 794 A.2d 5, 24 (Del. Ch. 2002). "Such extraneous considerations or influences may exist when the challenged director is controlled by another." *Id.* To establish such control, a plaintiff must show that "'the directors are "beholden" to [the controlling person] or so under their influence that their discretion would be sterilized.'" *Id.*

While the duty of loyalty is generally directed towards a fiduciary's motivations in making a business decision, the duty of care concerns the care taken in the process by which that decision was reached. Thus, the duty of due care "requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (footnote and internal quotations omitted). Gross negligence in this context is "defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Id.* at 750. (internal quotations omitted).

The Moving Defendants challenge the Trustee's fiduciary duty allegations on two grounds. First, they argue that the allegations do not sufficiently identify the conduct of particular defendants, and instead rely on conclusory allegations that certain defendants were "involved in" or "participated in" the challenged transactions. Second, the Moving Defendants argue that where their conduct is sufficiently described, that conduct does not amount to a breach of fiduciary duty.

With respect to the first point, the Court agrees that conclusory allegations of mere "participation" or "involvement," even if accepted as true, do no more than raise the possibility of liability—they do not nudge a plaintiff's claim into the territory of plausibility. With that in mind, the Court analyzes the allegations as to each of the Moving Defendants.

a. BI-LO–Bruno's Defendants

The Trustee has sufficiently alleged claims for breach of fiduciary duty against each of the BI-LO–Bruno's Defendants.

i. *Brian Hotarek*

The Amended Complaint alleges that Brian Hotarek was a Bruno's director in June 2005, and was both a director and the President and CEO from January to April 5, 2007. As a member of Bruno's board, Hotarek approved the Cardinal Transaction and the Spin-Off, and as Bruno's CEO, he signed several documents related to the Spin-Off, including the Lease Assignment, the Interim Supply Agreement, and the Transition Services Agreement. According to the Amended Complaint, Hotarek also served as a director, the President, and the CEO of BI-LO during the Spin-Off.

Taken as true, these allegations support a reasonable inference that Hotarek breached his fiduciary duties to Bruno's. As a director of Bruno's and BI-LO, Hotarek stood on both sides of

transactions between the two entities during the Spin-Off, including the Lease Assignment and Membership Interest Purchase Agreement. Thus, the Trustee has sufficiently alleged that Hotarek was interested in those transactions, and therefore, the Trustee has stated a claim against Hotarek for breach of the duty of loyalty.

Furthermore, the Trustee's allegations sufficiently state a claim for breach of the duty of care against Hotarek. The Amended Complaint alleges that while insolvent, Bruno's board approved all the challenged transactions without a meeting and at the behest of its sole shareholder, Lone Star. The lack of a deliberative process and wholesale acceptance of orders from Bruno's sole shareholder, at a time when the board's fiduciary duties ran to Bruno's creditors, constitutes the type of deliberate disregard that can amount to gross negligence.

ii.     *Brian Carney*

The Trustee also has sufficiently pleaded a breach of fiduciary duty claim against Brian Carney. According to the Amended Complaint, Brian Carney served as Bruno's CFO and Executive Vice President of Finance from January 2006 until April 5, 2007, and from that point until September 4, 2008, served as Bruno's Treasurer and Vice President. Additionally, the Amended Complaint alleges that Carney served as an Executive Vice President and the CFO for BI-LO. The Amended Complaint alleges that, in these capacities, Carney stood on both sides of the Spin-Off by negotiating its terms as an executive of BI-LO, and negotiating with Bruno's for transition service fees.

Taken as true, these allegations provide a plausible basis for a breach of duty claim against Carney. By negotiating the terms of the Spin-Off and the Transition Services Agreement, both of which are alleged to have caused significant harm to Bruno's, it is plausible that Carney's presence on both sides of these transactions led him to be motivated by an interest

other than what was in the best interests of Bruno's. Thus, the Amended Complaint states a claim for breach of the duty of loyalty against Carney.

*iii.*     *Kenneth Jones*

For similar reasons, the Amended Complaint sufficiently pleads a breach of fiduciary duty as to Kenneth Jones. According to the Amended Complaint, he too was an officer of both Bruno's and BI-LO. From July 23, 2005 to April 5, 2007, he was Bruno's Treasurer, and was also Bruno's Senior Vice President of Finance and Treasury from January 2, 2006 to April 5, 2007. The Amended Complaint alleges that Jones "participated in" the Spin-Off transaction. This alone is insufficient to plead a breach of duty. Nor is it sufficient to simply allege that Jones knew about Bruno's insolvency and therefore "should have communicated that fact," to no one in particular.

However, the Amended Complaint also alleges that Jones "determined the amounts BI-LO charged Bruno's" for "the intercompany payments." The Court interprets this statement to allege that Jones had and exercised the discretion to decide the amounts BI-LO charged Bruno's for transition services and in repayment of cash advances, at a time when Jones held fiduciary positions at both companies.[25] This allegation, unlike the others, gives rise to a reasonable inference that Jones breached his duty of loyalty by being on both sides of transactions in which he made decisions that allegedly harmed Bruno's.

b.     Bruno's Officer Defendants

The Trustee has not sufficiently pleaded a breach of fiduciary duty claim against any of the Bruno's Officer Defendants.

---

[25] Although the Court holds that the current allegations against Jones are barely sufficient, the Trustee must include more specific allegations to fairly explain his claims against Jones concerning these "intercompany payments," if he amends his pleadings pursuant to the leave granted in the following section of this Opinion.

First, the allegations regarding Gayler and Moore do not identify any conduct that could form the basis of such a claim. The Amended Complaint alleges that both "were involved with" or "participated in" certain transactions. As the Court has already explained, such conclusory allegations are insufficient to withstand a motion to dismiss. That Gayler and Moore allegedly knew or should have known about Bruno's insolvency and "had a duty to communicate it" are similarly unavailing because there is no indication of whom they should have communicated with and what effect such communication would have. The Trustee argues that it is reasonable for the Court to infer that Gayler and Moore should have communicated with people at Bruno's who had the ability to stop the wrongful transactions. But the Amended Complaint alleges that all of the challenged transactions were carried out to benefit Bruno's parent and sole shareholder, Lone Star, which allegedly dominated Bruno's board. Assuming these allegations to be true, none of Bruno's officers could have stopped the transactions because they were all approved by a board beholden to Lone Star.

The Trustee's allegations as to the Bruno's Officer Defendants other than Gayler and Moore are more specific. Nevertheless, none of their alleged conduct constitutes a breach of fiduciary duty. Unlike the BI-LO–Bruno's Defendants, none of the Bruno's Officer Defendants were on both sides of any transaction. Rather, in support of the duty of loyalty claims against the Bruno's Officer Defendants, the Trustee relies on allegations that Lone Star dominated and controlled all of the Defendants. However, the Trustee has alleged no facts from which the Court can infer that any of the Bruno's Officer Defendants were beholden to Lone Star or so under Lone Star's influence that their discretion was "sterilized."

Nor has the Trustee sufficiently pleaded that the transactions in which the Bruno's Officer Defendants were involved cannot be attributed to a rational business purpose.

Specifically, the Trustee argues that the Regions Bank Loan did not serve a "valid business purpose" because it resulted in the mortgaging of all of Bruno's assets to give preference to the unsecured debts of an insider. First, as the Court has already explained, the decision to pay debts owed to an insider, rather than those owed to another creditor, does not, without more, allege harm to the company itself. Second, using unencumbered assets to secure a loan, even when insolvent, is not a transaction that cannot be attributed to a rational business purpose. Rather, one rational business purpose of such a transaction is to increase liquidity.

Thus, even if the Trustee had alleged that each of the Bruno's Officer Defendants made actual decisions or engaged in other identifiable conduct related to the challenged transactions, the Amended Complaint fails to plead facts demonstrating that those decisions were made with a disloyal motive or were so irrational that they are not subject to the protection of the business judgment rule. Thus, the Trustee's allegations regarding the Bruno's Officer Defendants do not raise a reasonable inference that any of them breached their fiduciary duties. The Trustee will, however, be permitted to replead his claims against these defendants, as it appears possible that further factual allegations could save these claims.

## CONCLUSION

Plaintiff's Objections to and Motion to Strike Exhibits is **GRANTED** in part and **DENIED** in part because the exhibits attached to the Lone Star Defendants' Motion to Dismiss are not central to the Trustee's claims, and the affidavits, though judicially noticed for their existence, cannot be used to dispute the Trustee's factual contentions. But even though the Court does not incorporate the exhibits into the Amended Complaint, it does not strike them either.

The Lone Star Defendants' Partial Motion to Dismiss is **DENIED** because the Amended Complaint sufficiently pleads claims for fraudulent transfer under the AUFTA, and plausibly

alleges that Bruno's was insolvent—as that term is defined by Delaware fiduciary duty law—when the Cardinal Transaction was conducted.    The BI-LO–Bruno's Defendants' Motion to Dismiss is also **DENIED**.  The Trustee has sufficiently alleged Bruno's insolvency through March 2007 and has also alleged facts allowing the Court to reasonably infer that those Defendants breached fiduciary duties owed to Bruno's.

The Bruno's Officer Defendants' Motion to Dismiss or, in the Alternative, Motion for More Definite Statement is **GRANTED** in part and **DENIED** in part.  To the extent it incorporated arguments contained in the Motions filed by the Lone Star Defendants and the BI-LO–Bruno's Defendants, the Motion is **DENIED**.  In all other respects, the Motion is **GRANTED**, as the Amended Complaint's allegations fail to state a claim for breach of fiduciary duty against any of the Bruno's Officer Defendants.  Therefore, those claims are **DISMISSED**.  The dismissal is without prejudice, however, and the Trustee will be permitted, if he can, to amend his pleading only to add factual allegations regarding individual conduct of each of the Bruno's Officer Defendants that amounts to a breach of fiduciary duty.  Any such amendment must also include more specific allegations about Jones's involvement with "intercompany payments" from Bruno's to BI-LO.  The Trustee may file his amended pleadings on or before May 17, 2011 and must include as an exhibit a redlined copy of the Amended Complaint.

**SO ORDERED**.

April 26, 2011.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS